UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RICHARD D. GLINSKI,

                              Plaintiff,

        v.                                                    **DECISION AND ORDER**
                                                              03-CV-930S

RADIOSHACK, CAROL SAGASTA and
CANDACE McTIGUE,

                              Defendants.

## I.  INTRODUCTION

In this employment discrimination action, Plaintiff Richard D. Glinski alleges that

Defendants RadioShack, Carol Sagasta and Candace McTigue discriminated, harassed

and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e et seq. ("Title VII") and the New York Human Rights Law, N.Y. Exec. Law § 290,

et seq. ("NY HRL").    Presently before this Court is Defendants' Motion for Summary

Judgment.[1]  For the following reasons, Defendants' motion is granted in part and denied

in part.

## II.  BACKGROUND

Plaintiff is proceeding pro se in this action.    As is required under such

circumstances, this Court has construed Plaintiff's submissions liberally, and interpreted

them to raise the strongest claims and arguments that they suggest.  See Haines v.

---

[1]In support of their motion, Defendants filed the following documents: a Statement of Facts; the
Declaration of David Hosie; the Declaration of Candace S. McTigue; the Declaration of Carol S. Sagasta,
with attached exhibits; the Declaration of Thomas M. Moll, Esq., with attached exhibits; a memorandum of
law; a reply memorandum of law; a Supplemental Statement of Facts; and the Reply Declaration of Carol
Sagasta.
        In opposition to Defendants' motion, Plaintiff filed the following: the Response Affidavit of Richard
D. Glinski, with attached exhibits; a Response to Defendants' Statement of Facts; a Response to
Defendants' Memorandum of Law; the Sur-Reply Affidavit of Richard D. Glinski; a Sur-Reply Response to
Defendants' Supplemental Statement of Facts; and a Sur-Reply Memorandum of Law.

Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

## A.    Plaintiff's Complaint and Supplemental Complaint

On December 12, 2003, Plaintiff filed a Complaint with attached exhibits, and then later in the day, filed a Supplemental Complaint.  (Docket Nos. 1, 2.)  By Order dated January 12, 2004, this Court directed that Plaintiff's Supplemental Complaint and the attachments to his initial Complaint be construed together to form the operative pleading in this case.[2]  (Docket No. 4.)

In the Supplemental Complaint, Plaintiff alleges that Defendants discriminated against him in violation of Title VII and the NY HRL.   Construing the Supplemental Complaint liberally, Plaintiff alleges that Defendants terminated him because of his sex, maintained a hostile work environment, and retaliated against him after he complained about their unlawful conduct.  (Supplemental Complaint, pp. 3-4.)

## B.    Facts

### 1.    Plaintiff's Employment with RadioShack

The following facts are either undisputed[3] or drawn in the light most favorable to Plaintiff.  Defendant RadioShack is one of the world's largest electronic retailers and provides product support, including maintenance and repair, through Service Centers that

---

[2]Three exhibits are attached to the Complaint: (1) a 5-page, 14-paragraph statement of facts; (2) a copy of Plaintiff's EEOC Charge; and (3) a copy of Plaintiff's Right to Sue Letter.

[3]In his responses to Defendants' Statement of Facts and Supplemental Statement of Facts, Plaintiff identifies those facts with which he disagrees and sets forth his responses.  (See Docket Nos. 73 and 93.)

are located throughout the nation.  (Defendants' Statement, ¶¶ 1.[4])  RadioShack has employed Defendant Carol S. Sagasta since 1979, and she was the Bailey Avenue Service Center Manager and the Service Center's highest ranked supervisor at all times relevant to this litigation.  (Defendants' Statement, ¶¶ 2, 3.)  Defendant Candace S. McTigue, who RadioShack has employed since 1994, was Sagasta's Administrative Assistant. (Defendants' Statement, ¶ 4.)

On February 12, 2002, RadioShack hired Plaintiff to work as a Consumer Technician at the Bailey Avenue Service Center after he responded to an employment advertisement in the local newspaper.  (Defendants' Statement, ¶¶ 5-8.)  Plaintiff began work in that capacity on February 13, 2002.  (Defendants' Statement, ¶ 7.)  As a Consumer Technician, Plaintiff was expected to service, diagnose, order parts for, and repair consumer electronic products.   (Defendants' Statement, ¶ 8.)   Other Consumer Technicians included James Borks, John Weinreich, Alan Tanner, Robert Hughes, Keith Flick, Anthony Morganti, Joseph Skowronski, David Hosie, Jessie Perison and Michael Suttel.  (Defendant's Statement, ¶ 10.)

### 2.    RadioShack's Discrimination and Harassment Policies

RadioShack utilizes a "Team Answer Book" to serve as an overview and guide to its culture, policies and benefits.  (Defendants' Statement, ¶ 12.)  The Team Answer Book explains RadioShack's policies prohibiting discrimination, harassment and retaliation in the workplace.  (Defendants' Statement, ¶ 13.)  Each employee is required to read and expected to comply with the policies and procedures set forth in the Team Answer Book.

---

[4]Referring to Defendants' Statement of Undisputed Facts, which contains citations to the record evidence.

(Defendants' Statement, ¶ 14.)  RadioShack's "People Services" department, located in Forth Worth, Texas, was responsible for handling complaints of workplace harassment made by RadioShack employees.  (Defendants' Statement, ¶ 18.)  The Team Answer Book also instructs employees that they can lodge complaints with their manager, department head or any RadioShack officer, including the chairman and chief executive officer.  (Sagasta Declaration, Exhibit A, pg. 36.)

### 3.   Plaintiff's Complaints

Plaintiff contends that his co-workers began harassing him several weeks after he was hired and continued to do so for the duration of his employment.  (Glinski Response Aff., ¶¶ 4, 49.)  Plaintiff documented this conduct on a daily basis.  (Glinski Response Aff., ¶ 50 and Exhibit A.)   Plaintiff recounts these incidents in 908 separate paragraphs spanning 97 pages.  (Glinski Response Aff., Exhibit A.)   The incidents are far too numerous to list, but Plaintiff summarizes them as follows:

> The harassment and retaliation included: inappropriate comments and gestures directed at me, interference with my work, attempts to physically intimidat[e] me, various actions successfully taken to lower my production and therefore my wage, abusive use of surveillance coupled with the paging system, "stalking," unjust criticism of my employee performance, unjust disciplinary action, termination of employment without cause as well as Defendants' false report of "insubordination" as the reason for my termination, which resulted in denial of my Unemployment Insurance claim.

(Glinski Response Aff., ¶ 51.)

Plaintiff first complained to Sagasta about his co-workers' conduct on or about March 25, 2002, and she advised him to ignore the harassment and it would stop.  (Glinski Response Aff., ¶ 5.)   According to Plaintiff, the harassment did not stop, and it further

4

became apparent to him that Sagasta was a participant in the conduct that he found offensive.  (Glinski Response Aff., ¶ 8.)  Consequently, on May 3, 2002, Plaintiff contacted People Services and filed a complaint with Lorena Torres.  (Defendants' Statement, ¶ 19; Glinski Response Aff., ¶ 9.)  Torres directed Plaintiff to file his complaint in writing, which he did in a letter to her dated May 5, 2002.  (Defendants' Statement, ¶ 20; Glinski Response Aff., ¶ 9 and Exhibit E.)  Along with other conduct, Plaintiff complained of "innuendos concerning homosexuality."  (Glinski Response Aff., Exhibit E.)  In particular, he complained that

> Mike Suttel made a comment in an annoyed or angry tone of voice referring to "gay boy music" while standing next to me at the computer.
>
> Dave Hosie made a comment about someone being a "dick smoker."
>
> There were other comments made that I believe were to either accuse me of being gay or get some kind of response from me to find out if I am gay.
>
> Keith brushed up against me and brushed up against my back as he went by.

(Glinski Response Aff., Exhibit E (emphasis in original).)

People Services investigated Plaintiff's complaints with Sagasta's help.  (Defendants' Statement, ¶¶ 23-24.)   It concluded its investigation on May 9, 2002, and issued Hosie a written reprimand for making inappropriate comments regarding sexual orientation and Sagasta reviewed RadioShack's harassment policies with him.  (Defendants' Statement, ¶¶ 25-26; Glinski Response Aff., ¶ 10.)  Moreover, Sagasta and Tigue counseled each Service Center employee and instructed them to review and comply with the Team Answer Book policies and procedures.   (Defendants' Statement, ¶ 27;

Glinski Response Aff., ¶ 10.)

In June of 2002, several weeks after Hosie was reprimanded, the harassment resumed. (Glinski Response Aff., ¶ 11.) Plaintiff again complained to People Services and spoke to a human resources representative named Sabrina Williams on several occasions. (Glinski Response Aff., ¶ 11.)

On or about June 12, 2002, Sagasta held a 2-hour meeting with Plaintiff in her office regarding his complaints and telephone calls to Williams. (Glinski Response Aff., ¶ 12.) Sagasta directed Plaintiff not to contact People Services, but instead, to bring any concerns to her attention. (Glinski Response Aff., ¶ 12.) Plaintiff alleges that during this meeting, Sagasta made a sexually suggestive remark and drew graphic pictures on her desk blotter in front of him.[5] (Defendants' Statement, ¶ 28; Glinski Response Aff., ¶ 12.)

On June 14, 2002, Plaintiff telephoned Williams to complain about Sagasta's conduct. (Glinski Response Aff., ¶ 14.) Plaintiff sent People Services a written complaint on June 16, 2002. (Defendants' Statement, ¶ 29; Glinski Response Aff., ¶¶ 13, 14 and Exhibit E.) Therein, among the catalogue of other allegedly harassing conduct, Plaintiff included his complaint about the 2-hour meeting with Sagasta, as well as the following incidents:

> Debra asks me if I can look at her VCR/TV combination that is on top of the file cabinets in the office area. She shows me where it is and says, "It's the little one." She says it won't turn on. Joe worked on it before but it still doesn't work. I told her to have Joe work on it again and instead of ending the conversation she continues saying, "I just can't get it up."

---

[5]Plaintiff alleges that Sagasta said "yes, very small" while rubbing the left side of her chest and depicted the Service Center's territory in the shape of female breasts and male genitalia on her desk blotter. (Glinski Response Aff., ¶ 12.)

> Some time in March, Tony and Connie were standing by my part order bin and telling me that I had some parts that had come in.  Two of them were cabinet parts for five-inch B&W TV's that were too big for the bin.  Tony said something like, "Hey, Rich, here's a couple of big ones for you."  Then Connie started to laugh and giggle.  It became apparent they weren't talking about the parts.
>
> Connie the parts clerk seems to be trying to get me to look at her breasts by holding items, like a part, directly in front of them while asking me questions about it prolonging the conversation.  There always seems to be another woman with her who can watch what is happening.
>
> Jim . . . [is] using the indirect triangulating technique . . . [to] work[ ] in sexual innuendos and other innuendos to direct the remarks at me.
>
> Jim is talking incessantly, working in innuendos like "Did it <u>come</u> back there?" and others when he gets the chance.

(Glinski Response Aff., Exhibit E (emphasis in original).)

People Services investigated Plaintiff's complaint and concluded on August 21, 2002, that nothing therein could be substantiated.  (Defendants' Statement, ¶¶ 30-32; Glinski Response Aff., ¶¶ 15-16.)  During the course of People Service's investigation, Plaintiff spoke to Williams and to Marva Borders, the Vice-President of People Services.  (Glinski Response Aff., ¶ 17.)  Borders allegedly advised Plaintiff that "she would put a process in place that would bring closure to the issue."  (Glinski Response Aff., ¶ 17.)

It appears that Plaintiff believes that the "process" Borders referred to involved installing surveillance equipment in his work area.  (Glinski Response Aff., ¶¶ 17, 18.)  Not long after his discussion with Borders, RadioShack posted signs in Plaintiff's work area that audio and video surveillance was in use, but no cameras were visible to Plaintiff.  (Glinski Response Aff., ¶ 18.)  Plaintiff alleges that Defendants monitored him with the surveillance

equipment and harassed him by repeatedly paging him over the public address system after each repair he finished.  (Glinski Response Aff., ¶ 19.)

In October of 2002, Plaintiff requested that his work station be moved so that he could get away from his co-workers.  (Plaintiff's Statement, ¶ 7.)  RadioShack accommodated this request and moved Plaintiff's work station to the back of the Service Center and away from most of the other technicians.  (Defendants' Statement, ¶ 33; Plaintiff's Statement, ¶ 7.)

**4.    Reductions in Plaintiff's Pay**

Each Consumer Technician at RadioShack was assigned particular product lines or product types to service and repair.  (Defendants' Supplemental Statement, ¶¶ 12, 17-27.)  RadioShack hired Plaintiff to service and repair televisions and computer monitors.  (Defendants' Supplemental Statement, ¶ 15.)  Plaintiff did not have experience repairing computer monitors, but he had twenty-five years' worth of experience repairing televisions, and he expressed confidence that he could learn to repair computer monitors given their similarity to televisions.   (Defendants' Supplemental Statement, ¶ 16; Plaintiff's Supplemental Statement, ¶ 5.)

RadioShack paid Consumer Technicians a pre-determined hourly rate or an earned commission, whichever was greater.  (Defendants' Supplemental Statement, ¶¶ 29, 32.)  Accordingly to Plaintiff, the hourly rate was $10.00 per hour or $400.00 per week.  (Plaintiff's Supplemental Statement, ¶ 9.) Employees earned commission according to pre-determined piece-rate or labor rate schedules.  (Defendants' Supplemental Statement, ¶ 30.)  The commission was calculated by multiplying the product-type labor rate by the

number of repaired items.  (Defendants' Supplemental Statement, ¶ 32.)  However, the product labor rate was not dependent on the amount of time it took to complete the repair. (Defendants' Supplemental Statement, ¶ 33.)  Thus, the same commission would be earned whether the repair took ten minutes or three days to complete.  (Defendants' Supplemental Statement, ¶ 33.)

Sagasta distributed work among the Consumer Technicians according to the product line or product type they serviced.  (Defendants' Supplemental Statement, ¶ 61.) When necessary, Sagasta assigned Consumer Technicians products that fell outside of their product lines depending on backlog, the number of units reaching thirty-day status, turn-around time requirements and employee vacations.  (Defendants' Supplemental Statement, ¶ 62.)

According to Defendants, from February 15, 2002 (Plaintiff's first pay period) through May 3, 2002 (the date of Plaintiff's first harassment complaint to People Services), Plaintiff's average weekly commission earnings were $677.00.  (Defendants' Supplemental Statement, ¶ 38.)  From May 4, 2002, through December 31, 2002, Plaintiff's average weekly commission earnings were $628.00.  (Defendants' Supplemental Statement, ¶¶ 39, 46, 47.)

Plaintiff contends that comparing average earnings does not reflect weekly decreases in his pay, nor does it account for the temporal proximity of the decreases to his complaints. (Plaintiff's Supplemental Statement, ¶¶ 13-14, 17, 19.)  He states that his earnings steadily decreased (with the exception of the last few months of his employment) soon after he first complained to People Services in May of 2002.  (Glinski Responding Aff., ¶ 47.)  For example, Plaintiff contends that his weekly earnings were approximately

9

$400 less than the $900 mid-point earnings range he was quoted when he was hired. (Glinski Responding Aff., ¶ 47.)  As of the date of his termination, Plaintiff's cumulative earnings were $31,000 below the mid-point range quoted to him, and he was the least paid technician at RadioShack by approximately $5,000.  (Glinski Responding Aff., ¶ 48.)

### 5.   Plaintiff's EEOC Charge and Subsequent Performance Evaluations

Because Williams and Borders did not resolve his complaints, Plaintiff contacted the Equal Employment Opportunity Commission ("EEOC") on November 20, 2002.  (Glinski Response Aff., ¶ 24.)  He filed a Charge with the EEOC on March 17, 2003. (Supplemental Complaint, Exhibit 2.)  Therein he alleged that RadioShack was discriminating against him based on his sex and retaliating against him by lowering his pay because he complained about his co-workers' harassment.  (Supplemental Complaint, Exhibit 2.)  He also alleged "same sex harassment" by his manager[6] and co-workers.  (Supplemental Complaint, Exhibit 2.)

In early April of 2003, Sagasta completed Plaintiff's first annual performance review and rated Plaintiff overall as "average."  (Sagasta Decl., ¶ 46.)  Sagasta rated Plaintiff a "1",[7] in the categories "has the ability to take and use constructive criticism and benefit by it" and "is cooperative, courteous, and tactful in working with fellow employees." (Sagasta Decl.., Exhibit M.)   Plaintiff contested this review and submitted a written rebuttal. (Plaintiff's Statement, ¶ 8.)

On September 16, 2003, the EEOC issued Plaintiff a Right to Sue Letter after

---

[6]It is noted that Plaintiff's manager, Sagasta, is a female.

[7]A "1" means "consistently below acceptable performance calling for immediate and substantial improvement."  (Sagasta Decl., Exhibit M.)

finding that it could not establish any statutory violations.  (Supplemental Complaint, Exhibit 3.)   Ten days later, Sagasta issued Plaintiff a written "final warning" concerning his unacceptable conduct and failure to follow policies.  (Sagasta Decl., ¶ 51 and Exhibit O.) In particular, Sagasta warned Plaintiff that he could not continue to be "impolite and insolent," make certain specific repairs without manager approval, raise his voice and become visibly angry in the shop, call co-workers names and "yell out" at them, provoke co-workers, or "lash out at others."  (Sagasta Decl., Exhibit O.)  Sagasta warned that Plaintiff's continued failure to abide by RadioShack's policies or further unacceptable outbursts would result in "disciplinary actions up to and including the immediate termination of your employment with RadioShack."  (Sagasta Decl., Exhibit O.)  Plaintiff responded to this warning in writing.  (Plaintiff's Statement, ¶ 11.)

On November 18, 2003, Sagasta warned Plaintiff not to leave the premises without authorization and without punching-out.  (Sagasta Decl., ¶ 52 and Exhibit P.)  This warning was prompted by Plaintiff twice leaving the building and driving away in his car for longer than fifteen minutes without notifying Sagasta.  (Sagasta Decl., Exhibit P.)   Plaintiff disputes this account.  (Plaintiff's Statement, ¶ 12.)  On November 19, 2003, Sagasta issued a memorandum to all hourly employees regarding break periods and leaving the premises for personal business while on the clock.  (Sagasta Decl., ¶ 53 and Exhibit Q; Plaintiff's Statement, ¶ 12.)

### 6.     Plaintiff's Federal Complaint and Termination

Plaintiff had his Complaint in this action notarized on December 9, 2003.  (Glinski Response Aff., ¶ 27.)  Plaintiff contends that he noticed RadioShack employees loitering

at the local store where he was copying his Complaint.  (Glinski Response Aff., ¶ 27.)

On December 10, 2003, Plaintiff's co-worker, Alan Tanner, loudly commented that "We knew that was the direction you were going," which was apparently a reference to Plaintiff's intention to file a federal lawsuit.  (Glinski Response Aff., ¶ 28.)  In addition, Sagasta advised Plaintiff of certain deficiencies in his job performance.  (Sagasta Decl., ¶ 56.)  That same day, Sagasta communicated her concerns about Plaintiff to Benny Benoit, who was the Director of the Central Region.  (Sagasta Decl., ¶ 57.)

The next day, December 11, 2003, Sagasta summoned Plaintiff to her office for a meeting to review his work assignments.  (Glinski Response Aff., ¶ 29.)  Plaintiff states that Sagasta was "extremely abusive," yelled throughout the meeting, and refused to assign him work.  (Glinski Response Aff., ¶ 29.)  Plaintiff claims that he suffered "extreme stress" because of Sagasta's behavior and left work immediately following the meeting.  (Glinski Response Aff., ¶ 29.)

Sagasta describes this meeting differently.  She states that she called Plaintiff and McTigue into her office to discuss certain procedures that she wanted followed concerning Plaintiff's repair list.  (Sagasta Decl., ¶ 58.)  Plaintiff allegedly became argumentative and made mocking faces as Sagasta spoke.  (Sagasta Decl., ¶ 58.)  Sagasta directed Plaintiff return to his workbench, and he walked out of the Service Center instead.  (Sagasta Decl., ¶ 59.)  Sagasta then consulted Benoit, and they decided to terminate Plaintiff's employment.  (Sagasta Decl., ¶ 60.)  Meanwhile, Plaintiff mailed his discrimination Complaint to federal court.  (Plaintiff's Statement, ¶ 14.)

Plaintiff's Complaint was received and filed on December 12, 2003.  (Docket No. 1.) Defendants terminated Plaintiff's employment that same day, just before Plaintiff was

12

about to punch-in.[8]   (Glinski Response Aff., ¶ 31; Sagasta Decl., ¶ 61.)   Immediately

thereafter, Plaintiff went to federal court and filed a Supplemental Complaint.[9]   (Glinski

Response Aff., ¶ 32.)

**C.   Procedural History**

As noted, Plaintiff filed his Complaint and Supplemental Complaint in this action on

December 12, 2003.   Defendants filed an Answer thereto on February 26, 2004.   The

parties completed discovery, and on January 13, 2006, Defendants filed the instant Motion

for Summary Judgment, which this Court took under advisement after full briefing.

## III.  DISCUSSION AND ANALYSIS

**A.   Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted

where the "pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."   FED. R. CIV. P.

56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return

a verdict for the non-moving party."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,

106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).   A fact is "material" if it "might affect the

---

[8]Plaintiff applied for unemployment benefits after his termination from RadioShack.  (Defendants'
Statement, ¶ 52.)  His application was twice denied by the New York State Department of Labor.
(Defendants' Statement, ¶¶ 53, 55.)  The denial was upheld at every stage of appellate review,
culminating with an affirmance by the Appellate Division of the New York Supreme Court, Third
Department.  (Defendants' Statement, ¶¶ 56-61.)

[9]Defendants correctly note that Plaintiff's original Complaint included a claim that his employment
had been terminated.  (Complaint, p. 3.)  Plaintiff alleges that he completed drafting the Complaint on
December 9, 2003, and mailed it on December 11, 2003.  (Plaintiff's Statement, ¶ 14.)  Given this timing,
Defendants contend that Plaintiff "intended to orchestrate his own termination."  (Sagasta Decl., ¶ 55.)

outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." Id.

**B.    Plaintiff's Claims**

Construing Plaintiff's Supplemental Complaint and response papers liberally, this Court finds that Plaintiff asserts three claims.  First, he claims that Defendants terminated him because he is a man.  Second, he claims that Defendants sexually harassed him and maintained a hostile work environment.  Finally, he claims that Defendants retaliated against him after he complained about their unlawful conduct.  (Supplemental Complaint, pp. 3-4.)  Defendants move for summary judgment on each claim.

**1.    Individual Liability under Title VII and the NY HRL**

Defendants correctly argue, and Plaintiff concedes,[10] that  individuals may not be held personally liable under Title VII.  See Tomka v. Seiler Corp., 66 F.3d 1295, 1313-16 (2d Cir. 1995), abrogated on other grounds by, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).  Accordingly, the federal claims against Sagasta and McTigue will be dismissed.

However, individual liability may lie under the NY HRL under certain circumstances. Pursuant to the New York Court of Appeals' decision in Patrowich v. Chem. Bank, individual liability under the NY HRL can lie against a corporate employee if he or she is shown to have (1) an ownership interest in the company, or (2) the power to do more than carry out personnel decisions made by others.  473 N.E.2d 11, 12, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659 (1984) (per curiam); see also Foley v. Mobil Chem. Co., 214 A.D.2d 1005, 1006, 626 N.Y.S.2d 908, 909 (1995).  The Second Circuit has further found that even if these two factors are unsatisfied, an individual may be nonetheless held liable

_____

[10]See Plaintiff's Responding Memorandum of Law, p. 2.

under a theory of aiding and abetting pursuant to NY HRL § 296(6).  See Tomka, 66 F.3d

at 1317; see also Frierson-Harris v. Hough, No. 05 Civ. 3077, 2006 WL 298658, at *8

(S.D.N.Y. Feb. 7, 2006).

Neither Sagasta nor Tigue has an ownership interest in RadioShack, and Plaintiff

has not presented any evidence that either had the authority to do more than implement

personnel decisions made by others.  Indeed, there is no allegation or proof that Tigue

played any part in the decision to reprimand or fire Plaintiff, and Sagasta had to consult

with Benoit before a termination decision could be made.   (Sagasta Decl., ¶ 60.)

Moreover, there is insufficient evidence to support an aiding and abetting theory.  As such,

the NY HRL claims against Sagasta and Tigue will be dismissed.

### 2.    Plaintiff's Sex Discrimination Claim

Under Title VII, it is unlawful for an employer to "discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).

It is well-settled that Title VII's prohibition of sex discrimination applies to men as well as

women.  Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 682, 103

S.Ct. 2622, 2630, 77 L.Ed.2d 89 (1983) ("Male as well as female employees are protected

against discrimination.").

Title VII and NY HRL discrimination claims are analyzed under the familiar burden-

shifting analysis first set forth by the United States Supreme Court in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973).  See

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43, 120 S.Ct. 2097, 2106,

147 L.Ed.2d 105 (2000); Memisevich v. St. Elizabeth's Med. Ctr., No. 03-CV-1348, 2006 WL 2277964, at *4 (N.D.N.Y. Aug. 9, 2006) ("When analyzing a case of discriminatory termination, the burden-shifting analysis of McDonnell Douglas governs."); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000) (identical standards apply to employment discrimination claims brought under both Title VII and NY HRL § 296) (citing cases).

First, the plaintiff must establish a *prima facie* case of discrimination.  See McDonnell Douglas, 411 U.S. at 802.  If the plaintiff meets this burden, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981).  If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  Weinstock, 224 F.3d at 42 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).  The plaintiff must then produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."  Weinstock, 224 F.3d at 42.  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  Id.  However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." Id. (quoting St. Mary's, 509 U.S. at 519).

To the extent Plaintiff alleges that Defendants fired him because he is a man, his

claim fails.[11]  A disparate treatment claim arises when an individual is treated less favorably than a member of the opposite gender under circumstances from which a gender-based motive could be inferred.  See Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean, 667 F.2d 305, 309 (2d Cir. 1981); see also Ott v. Perk Dev. Corp., 846 F.Supp. 266, 275 (W.D.N.Y. 1994).  Plaintiff simply cannot establish that his termination occurred under circumstances giving rise to an inference that he was fired because he is a man.  See Memisevich, 2006 WL 2277964, at *6 ("In a discriminatory discharge case, a plaintiff must demonstrate circumstances existing at the time of the termination that would "give rise to an inference" of discrimination.") (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)).

Even drawing all factual inferences in the light most favorable to Plaintiff, as must be done at this stage, this Court finds that there is no evidence in the record from which a reasonable trier of fact could conclude that Plaintiff was fired simply because he is a man.  For example, Plaintiff has offered no evidence demonstrating that RadioShack retained similarly situated women who engaged in the same conduct that Plaintiff engaged in.  See Memisevich, 2006 WL 2277964, at *6 (noting that "one recognized method of raising an inference of discrimination is a showing of disparate treatment") (citation omitted).  Given the circumstances leading up to Plaintiff's termination, including his repeated complaints and his acrimonious meeting with Sangasta the day before he was fired, no reasonable inference could be drawn that RadioShack fired Plaintiff simply

---

[11]Plaintiff's responding papers make clear that he believes his termination was retaliatory. (Plaintiff's Responding Memorandum, p. 3 ("the basis for the complaint under title VII [sic] is retaliation for opposing discrimination/sexual harassment").  However, a liberal reading of Plaintiff's Supplemental Complaint suggests that he alleges that RadioShack fired him because he is a man.  (Supplemental Complaint, pp. 3, 4.)  Given Plaintiff's pro se status, this Court considers that claim.

because he is a man.  RadioShack avers that it fired Plaintiff for cause, and there is no evidence that this legitimate, non-discriminatory reason is false, and instead, RadioShack actually fired Plaintiff because he is male.  In any event, it seems clear that Plaintiff himself believes that RadioShack fired him not because he is a man, but rather, because he complained about unlawful employment practices.  (See Plaintiff's Responding Memorandum, *passim*.)  Having thoroughly reviewed the record evidence, this Court finds that Defendants are entitled to summary on any claim that they unlawfully fired Plaintiff because he is a man.

### 3.      Plaintiff's Sexual Harassment/Hostile Work Environment Claims

Title VII's protections encompass sexual harassment that results in a hostile or abusive work environment.  Williams v. City of N.Y., No. 99 CV 2697, 2006 WL 2668311, at *17 (E.D.N.Y. Sep. 11, 2006) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).  A hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment action.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117, 122, S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002) (citation omitted).  Such an unlawful action is barred by Title VII, which has been interpreted to provide protection beyond "economic" or "tangible" discrimination. Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (citing Meritor Savings Bank, 477 U.S. at 64).  Rather, Congress enacted Title VII to "strike at the entire spectrum of disparate treatment of men and women in employment," including the requirement that employees work in a hostile or abusive environment.  Harris, 510 U.S. at 21.

To survive a motion for summary judgment, a plaintiff claiming that he was the victim of a hostile work environment based on sexual harassment must produce evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson v. NY State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999)); Williams, 2006 WL 2668211, at *17.   "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that [he] personally considered the environment hostile, and that the environment rose to some objective level of hostility." Leibovitz v. NY City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001).

It is important to note, however, that to be actionable, the harassment must be "on account of" a protected category.  Only conduct prompted by a plaintiff's protected status or directed at a plaintiff because of his protected status contributes to a hostile work environment claim.  Bush v. Fordham Univ., No. 04 Civ. 1847, 2006 WL 2720616, at *13 (S.D.N.Y. Sep. 25, 2006) (citing Richardson, 180 F.3d at 440).  The Second Circuit has cautioned that it is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).  Put simply, the plaintiff must "demonstrate that she was subjected to the hostility because of her membership in a protected class." Brennan v. Metro. Opera Ass'n Inc.,, 192 F.3d 310, 318

20

(2d Cir. 1999).

Here, Plaintiff appears to allege that he was harassed on a basis not protected by Title VII.  Plaintiff believes that he was harassed because his co-workers and managers perceived him to be homosexual.  (Plaintiff's Response Memorandum, p. 8; Defendants' Reply Memorandum of Law, p. 3-6.)   As both Plaintiff and Defendants recognize, discrimination based on sexual orientation is not actionable under Title VII.  See Dawson v. Bumble & Bumble, 398 F.3d 211, 217-218 (2d Cir. 2005); Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000).  Nor is discrimination based on *perceived* sexual orientation.[12] Spearman v. Ford Motor Co., 231 F.3d 1080, 1087 (7th Cir. 2002); Hamm v. Weyauwega Milk Prods., Inc., 199 F.Supp.2d 878, 895 (E.D. Wis. 2002).  While the Second Circuit has recognized that the failure to conform to gender stereotypes could form the basis of a Title VII complaint, that does not appear to be the circumstance here.  Dawson, 398 F.3d at 221.

Construing Plaintiff's position liberally, this Court will consider whether it could reasonably be concluded that Plaintiff was harassed or discriminated against simply because he is a man.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).  As noted, Plaintiff has identified a legion of

---

[12]As of January 16, 2003, the NY HRL bars discrimination based on sexual orientation, whether actual or perceived.  N.Y. Exec. Law §§ 296(1)(a) and 292 (27) (McKinney 2005).  However, there is no evidence in the record from which it could be reasonably inferred that Plaintiff's co-workers thought he was or perceived him to be homosexual.  Hosie, McTigue and Sagasta did not think Plaintiff was homosexual or perceive him to be such.  (Hosie Decl., ¶ 8; McTigue Decl., ¶ 26; Sagasta Decl., ¶¶ 62-66.)  Moreover, Plaintiff testified at his deposition that he is a heterosexual male, was married, fathered a child, is masculine, and has no feminine characteristics, traits, tastes or habits.  (Defendants' Statement, ¶¶ 62-68.)  He testified that nothing about the way he carried himself or from his outward appearance would cause others to perceive him as homosexual.  (Defendants' Statement, ¶ 71.)  Moreover, even if it is assumed that Plaintiff's co-workers thought he was or perceived him to be homosexual, the incidents alleged are either not motivated by Plaintiff's sexuality (actual or perceived), or are not severe or pervasive enough to satisfy the objective prong of the hostile work environment analysis.

incidents, principally set forth in 908 paragraphs spanning 97 pages, that he argues contributed to the hostile work environment at the Service Center.  (Glinski Response Aff., Exhibit A.)  This list is apparently culled from minute-by-minute copious notes that Plaintiff made on a daily basis during his employment with RadioShack.  (Glinski Response Aff., ¶ 50 and Exhibit A.)  The incidents range from the completely innocuous – "Candy walks in front of me as I arrive for work" – to the totally bizarre – use of unofficial nicknames such as "Jim, Oh, This, Guys and Everybody."[13]  (Glinski Response Aff., Exhibits A and E.)  A common theme running throughout these events is that Plaintiff interpreted just about any conduct to be objectionable, including conduct not directed at him or which he did not understand.  He repeatedly noted screws left on the floor, coughing by his co-workers,[14] misuse of the paging system and people "crossing in his path."  (Glinski Response Aff., Exhibit A.)  Some of Plaintiff's notes suggest paranoia,[15] others document general

_____

[13]Plaintiff contends that his co-workers used an "indirect triangulating technique" to talk about him without speaking directly to him.  (Glinski Response Aff., Exhibit E.)  Plaintiff describes the technique as follows:

> So if they want to say something inappropriate to me they can do it by saying something like "This sucks" meaning I suck or "Rich sucks."  A few actual examples are: Debra once said, "**This** is out of here" with the emphasis on "This" as if it were a name.  This was at a time when there were many comments being made to me about being fired.  Candy once sarcastically said, "**Oh**, I thought you were listening" with the emphasis on "Oh" as if it was a name.  They will make sure I know how it is meant by tone of voice or eye contact or some other means.

(Glinski Responding Aff., Exhibit E (emphasis in original).)

[14]Plaintiff apparently believes that his co-workers orchestrated a coughing campaign against him and he concludes that "Deliberate coughers include: Jim, Connie, Barb, Jessie, Joe, Lou and Alan, who is by far the worst offender."  (Glinski Response Aff., Exhibit E.)

[15]For example, Plaintiff repeatedly notes his belief that individuals from RadioShack were monitoring his home computer and spying on him outside of work.  (Glinski Response Aff., Exhibit A.)  The following incidents are illustrative of the type of peculiar conduct that Plaintiff alleges occurred:

> I just arrived.  On my way to my bench I pass the stack of empty shipping crates.  Stuck on one of the crates at waist height, is what looks like a tangle [sic] piece of dental floss.  This morning, I found some dental floss on the

workplace annoyances.[16]

Even considering this litany of events in the light most favorable to Plaintiff, this Court concludes that they are not actionable under Title VII.  First, the vast majority of the incidents (other than as set forth below) are wholly unrelated to sexual harassment or Plaintiff's gender.  Nothing in the record suggests that these actions were taken because Plaintiff is male.

Second, these incidents, as a matter of law, are insufficiently serious to support a

---

floor of my living room, right where I put my shoes on every day.  Then, on my bench, next to the phone, I find a small blue bowl with a spoon inside. Last night, I ate a bowl of cereal while watching TV in my living room.  This is something I rarely do.  When Bobby arrived, I asked him if that was his bowl.  He said yes, sorry and took it away.  These are more examples of the spying done on me in my home, possibly while I was sleeping.  I did not notice the floss last night.  This also implies that he entered a locked house and circumvented the alarm system.

. . .

My pen is missing from my bench.  When I go out to get another from my car, a black car is set up to go past in the parking lot as I walk out the door. This is a very common occurrence and has been happening for months. When I arrive at work in the morning, leave for or arrive from lunch and leave at the end of the day; a single vehicle will go by just as I step outside. Even though I arrive and leave at different times each day, it still happens.

. . .

On January 29, 2003, I put hand lotion on for the first time in months.  The next day at work, Candace made a point to put hand lotion on in front of me.

. . .

Defendants spied on me at the fitness club I was a member of.  For example, objects such as a cotton swab were placed on the floor in front of my locker at the fitness center.  The next day, the same type of swab was placed on the floor at the service center.

(Glinski Response Aff., Exhibit A; Supplemental Complaint, Exhibit 1.)

[16]For example, Plaintiff notes that "someone keeps making noises that sound like a railroad whistle with the signal generating equipment," "John . . . cuts right in front of me to bill out an invoice," "someone has moved my garbage can out away from its usual spot and placed it into the path I use everyday to get to my bench," and "Jim walks in front of me again as I am on my way back from part." (Glinski Aff, Exhibit A.)

23

hostile work environment claim.  Title VII is not a "general civility code."  See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1988). Therefore, casual comments, rude or derogatory remarks, and conduct motivated by personal animosity or personal feud cannot support a hostile work environment claim.  See Memisevich, 2006 WL 2277964, at *8; Norris v. N.Y. City Hous. Auth., No. 02 Civ. 6933, 2004 WL 1087600, at *12 (S.D.N.Y. May 14, 2004); Neratko v. Frank, 31 F.Supp.2d 270, 284 (W.D.N.Y. 1998).

As set forth above, however, Plaintiff does allege some incidents that arguably could constitute sexual harassment.  Plaintiff recounted these incidents during his deposition. (Defendants' Statement, ¶¶ 86-158.)   However, whether considered individually or collectively, this Court finds that the alleged incidents are not sufficiently severe or pervasive to constitute a violation of Title VII.  For example, the incidents include the following:[17]

•   Mike Suttel referred to music being played on a stereo as "gay-boy" music.  Plaintiff was not the individual playing the music, nor is he certain that Suttel was speaking to him.  (Defendants' Statement, ¶¶ 86-90.)

•   Dave Hosie commented that an unidentified "someone" was a "dick smoker."  While Plaintiff thought Hosie could have been speaking about him because his name is Richard, he acknowledged that the comment was open to interpretation and could have been directed at another person.  (Defendants' Statement, ¶¶ 91-100.)

•   Keith Flick bumped into Plaintiff on more than one occasion in what Plaintiff concedes was a non-sexual manner.  (Defendants' Statement, ¶¶ 101-102.)

---

[17]Defendants note that Plaintiff did not complain about several of the alleged incidents.  However, "unreported incidents of harassment alleged by the plaintiff regarding the issue of hostile work environment, whether or not an explanation for the failure to report is proffered, stand on the same footing as reported incidents; both must be taken as true at the summary judgment stage."  Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62-63 (2d Cir. 1998); Nader v. Brunalli Const. Co., 98 CV 2085, 2002 WL 724597, *10 (D.Conn. Mar. 26, 2002).

- Although uncertain that it actually happened, Plaintiff thought he recalled two instances where male co-workers touched their hands to their zippers and grinned at him. (Defendants' Statement, ¶¶ 103-106.)

- Deborah used sexually suggestive phrases such as "little one," "turn on," "get it up," and "can't get it up" while describing problems with a broken television set. Plaintiff concedes that these phrases could have been legitimate references to the television set and Deborah's description of why it was not working. (Defendants' Statement, ¶¶ 107-113.)

- Connie put two cabinets in Plaintiff's parts bin and then Tony Morganti yelled to Plaintiff that he had a "couple of big ones" in his bin. Plaintiff interpreted television cabinets as a "metaphor for breasts." (Defendants' Statement, ¶¶ 114-118.)

- Connie drew attention to her breasts by holding parts directly in front of them to draw Plaintiff's eye. Plaintiff concedes that this conduct is subject to interpretation. (Defendants' Statement, ¶¶ 119-121.)

- Jim asked "did it come back here," and allegedly emphasized the word "come" as if to refer to an orgasm. Plaintiff does not know if the comment was directed at him. (Defendants' Statement, ¶¶ 122-126.)

- Sagasta emphasized the words "big ones" when she referred to two Holiday Inn hotels. Plaintiff interpreted this phrase to be a comment on the size of Connie's breasts. (Defendants' Statement, ¶¶ 127-130.)

- Sagasta rubbed her breast and said "very small" and drew a map of the United States on her desk blotter that, in Plaintiff's view, resembled male genitalia and female breasts. (Defendants' Statement, ¶¶ 131-137.)

- Deborah asked Plaintiff if he was "heading out" on a service call, which Plaintiff interpreted to mean "head in-out" as in "the head of a penis going in and out." Plaintiff did, however, admit that it was possible Deborah was simply asking him if he was leaving to go on a service call. (Defendants' Statement, ¶¶ 138-140.)

- Plaintiff considered certain antennas, screws, nuts and bags left in the Service Center to be phallic symbols. (Defendants' Statement, ¶¶ 141-145, 148, 157-158.)

- Plaintiff overheard Keith and Alan discussing a soldering iron. Keith told Alan to "put it in the back," which Plaintiff interpreted as a reference to "putting a soldering iron in someone's anal cavity." (Defendants' Statement, ¶¶ 149-150.)

- On December 18, 2002, Plaintiff asked Sagasta for more work and in the course of her response she stated "everything is little." Plaintiff construed this as a reference to the size of his penis. (Defendants' Statement, ¶ 151-153.)

25

•      On December 23, 2002, Alan offered to get Plaintiff something to drink.  Plaintiff interpreted the word "drink" to mean "ejaculate."  (Defendants' Statement, ¶¶ 154-156.)

Assuming that these incidents occurred, this Court finds that they simply do not rise to the level of being objectively severe or pervasive to sustain a hostile work environment claim based on sex.  Courts examine various factors to ascertain whether a work environment is sufficiently hostile or abusive to support a Title VII claim.  These factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance."  Leibovitz, 252 F.3d at 188 (citing Harris, 510 U.S. at 23); Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003).  Isolated and occasional instances of harassment do not ordinarily rise to this level.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-271, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam).  The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. . . ." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).

In this Court's view, no reasonable person would find that the incidents above rise to a hostile level.  For example, Deborah's description of the broken television, Tony Morganti's description of the cabinets in Plaintiff's parts bin, Sagasta's description of the hotels, Deborah's inquiry into whether Plaintiff was leaving on a service call, Keith and Alan's discussion of the soldering iron, Sagasta's description of how much work was available, and Alan's offer to get Plaintiff something to drink are all perfectly innocuous statements that any reasonable person would likely find to be innocent.  The statements

26

take on a sexual connotation only when an individual strains to infer one, which Plaintiff apparently has done.  Objectively, these comments are not offensive or severe.  Moreover, given the nature of the work performed in an electronics repair shop, it practically defies all logic to conclude that the presence of antenna and screws constitutes a hostile display of phallic symbols.  Finally, this Court finds that the remaining incidents, even if assumed true, are not sufficiently pervasive or severe such that from an objective standpoint, a reasonable employee would find the conditions of his or her employment altered for the worse.  See id.  For all of the reasons stated above, this Court finds that Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim.

### 4.     Plaintiff's Retaliation Claim

Title VII makes it unlawful for employers to retaliate against employees who participate in protected activities, such as challenging discriminatory practices or actions. 42 U.S.C. § 2000e-3(a); Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).  When evaluating a Title VII retaliation claim, courts employ the McDonnell-Douglas burden-shifting analysis.

Under that framework, the plaintiff must first establish a *prima facie* case of retaliation.  If the plaintiff makes such a showing, the burden shifts to the defendant, who must point to evidence that there was a legitimate, non-retaliatory reason for the employment decision at issue.  If the defendant meets that burden, the plaintiff must demonstrate that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson, 180 F.3d at 443.

To establish a *prima facie* case of retaliation, Plaintiff must show that (1) he participated in a protected activity, (2) his participation was known to the defendant, (3) he suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action.  Richardson, 180 F.3d at 443; Jones v. Smithkline Beecham Corp., 309 F.Supp.2d 33, 356 (N.D.N.Y. 2004).

Defendants concede that Plaintiff participated in protected activity when he complained about what he considered to be acts of discrimination.[18]  (Defendants' Reply Memorandum, pp. 8-9.)  For example, Plaintiff engaged in protected activity when (1) he complained to Sagasta on March 25, 2002, (2) he complained to People Services verbally and in writing in May of 2002, (3) he complained to People Services verbally and in writing in June of 2002, (4) he filed a Charge with the EEOC on March 17, 2003, and (5) he filed his Complaint in this case on December 12, 2003.  See Gallagher v. Delaney, 39 F.3d 338, 349 (2d Cir. 1998); Williams v. Home Depot U.S.A., Inc., No. 02 Civ. 5353, 2005 WL 2429421, at *14-*15 (S.D.N.Y. Sep. 30, 2005); Patrick v. Local Union No. 282, No. 99-CV-8314, 2005 WL 2179415, at *4-*5 (Sep. 9, 2005).  Moreover, Defendants concede that they had knowledge that Plaintiff engaged in this protected activity.  (Defendants' Reply Memorandum, p. 9.)

As to the third element, Plaintiff contends that the following incidents constitute adverse employment actions: (1) Sagasta's issuance of a negative performance review in April of 2003; (2) Sagasta's issuance of a final written warning on September 26, 2003; (3)

---

[18]It is not required that the conduct opposed actually constitute a violation of Title VII.  See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999) ("[A] plaintiff need not establish that the conduct [he] opposed was actually a violation of the statute so long as [he] can establish that [he] possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law." (internal quotation and alteration omitted)); see also Bush, 2006 WL 2720616, at *14.

Sagasta's change of the break policy on November 19, 2003; (4) reductions in his pay; (5) his termination on December 12, 2003, and (6) Defendants' opposition to his application for employment benefits.  Defendants argue that only the alleged reductions in Plaintiff's pay and his termination constitute adverse employment actions.

The United States Supreme Court recently clarified the necessary showing a plaintiff must make to demonstrate an adverse employment action.  A plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, __ U.S. __, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (finding a reassignment of duties to be actionable retaliation, even though both former and present duties fell within the same job description).  In this regard, whether the employment action at issue is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  Kessler v. Westchester County Dep't of Soc. Servs., No. 05-2582-cv, 2006 WL 2424705, at *10 (2d Cir. Aug. 23, 2006) (citing White, 126 S.Ct. at 2417.)

Under White, this Court finds that the negative employment reviews, the reductions in Plaintiff's pay and Plaintiff's ultimate termination constitute actionable employment actions.  See 126 S.Ct. at 2415.  That is, a reasonable jury could find that these incidents "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id.  It is not likely, however, that a reasonable person would find that the change in the break policy or Defendants' opposition to Plaintiff's unemployment application (which obviously post-dated his employment) materially changed Plaintiff's

working conditions, altered his responsibilities, or dissuaded him from exercising his rights under Title VII.  White, 126 S.Ct. at 2415.  Plaintiff has satisfied the third element of his *prima facie* case.

Defendants argue that Plaintiff cannot satisfy the fourth prong of the analysis because he cannot demonstrate a causal or temporal connection between his involvement in protected activity and the adverse employment actions.   This Court disagrees.

To establish a causal connection, a plaintiff must demonstrate that the adverse employment action "occurred in circumstances from which a reasonable jury could infer retaliatory intent."  Parrish v. Sollecito, 258 F. Supp.2d 264, 268 (S.D.N.Y. 2003).  This may be proven "indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . ."  Gordon v. NY City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (the causal connection requirement "can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment"). "A close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse action is alone sufficient to establish causation . . . ."  Parrish, 258 F. Supp.2d at 268 (citing Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001)). However, "if the temporal proximity alone is the basis for determining a casual connection, it must be very close."  Parrish, 258 F. Supp.2d at 268 (citing Clark County Schl. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed.2d 509 (2001)).

For the reasons fully set forth in the following discussion of pretext, this Court finds that Plaintiff has demonstrated the necessary causal and temporal connection between his protected activity and the adverse employment actions such that he has fulfilled his burden

of establishing a *prima facie* case of unlawful retaliation.

The burden now shifts to Defendants to proffer a legitimate, non-discriminatory reason for carrying out the adverse employment actions.  As noted above, Defendants have presented evidence in support of their proffer that they instituted the adverse employment actions against Plaintiff for cause, notably Plaintiff's failure to follow company guidelines and his insubordination.  This is enough to shift the burden back to Plaintiff.

To defeat Defendants' motion, Plaintiff must now produce "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [retaliation] was the real reason for the discharge." Stephens v. SUNY at Buffalo, 11 F.Supp.2d 242, 250 (W.D.N.Y. 1998) (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)).  Having thoroughly examined the record evidence, and drawing all reasonable inferences in Plaintiff's favor, this Court finds that given the timing of the adverse actions in this case and the existence of disputed issues of material fact, a rational trier of fact could conclude that Defendants' proffered reason for taking adverse actions against Plaintiff is false, and that unlawful retaliation was the real reason for their conduct.

As an example of the reductions in Plaintiff's pay, it is noted that Plaintiff first engaged in protected activity when he complained to Sagasta on March 25, 2002.  In the three weeks immediately preceding this complaint, Plaintiff had weekly earnings of $848.74, $773.58, $905.50, respectively.  (Glinski Response Aff., Exhibit W.[19])  The week following his complaint, Plaintiff's earnings dropped to $601.42, and then to $452.00 the

---

[19]Exhibit W  is a copy of the payroll information that Defendants provided to Plaintiff in discovery.

31

second week following.  (Glinski Response Aff., Exhibit W.)

Plaintiff next complained on May 3 and 6, 2002.  In the three weeks prior to these complaints, he had weekly earnings of $1,018.51, $676.25, and $681.67.  (Glinski Response Aff., Exhibit W.)  In the two weeks following these complaints, Plaintiff's earnings were $674.19 and $791.25.  (Glinski Response Aff., Exhibit W.)

Plaintiff then complained again in the beginning of June.  His earnings in the three weeks prior to this complaint were $834.00, $621.01, and $617.00.  (Glinski Response Aff., Exhibit W.)  In the two weeks following the complaint, his earnings were $678.50 and $600.00.  (Glinski Response Aff., Exhibit W.)

While this Court is cognizant that not all of the discrepancies in pay are significant, material issues of fact exist as to what the differences in pay may be attributable to.  For example, periods of training, days off, and reduced hours undoubtedly contribute to lower earnings.  However, there is also evidence in the record that Sagasta had discretion to control work assignments and determine which technicians would receive more lucrative (or less time-intensive) repair jobs.  Plaintiff states that Sagasta exercised this discretion to deny him work opportunities, which reduced his earnings, in retaliation for his complaints.  Sagasta denies doing so.  This is an issue that the jury must decide.  See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (plaintiff must adduce evidence sufficient to raise an issue of fact as to whether the employer's reason was merely a pretext for retaliation).

This Court further notes an additional event that is arguably based on protected activity and is relevant to the issue of Defendants' motivation and the truthfulness of their proffered reason.  Just ten days after Plaintiff received his Right to Sue Letter from  the

32

EEOC (which could arguably be considered a continuation of Plaintiff's protected activity), Sagasta issued Plaintiff the final warning concerning his unacceptable conduct and failure to follow policies. Not only could a trier of fact find the timing of this warning suspect, it does not appear that Defendants issued previous written warnings to Plaintiff such that it would be reasonable to term this one "final."

Moreover, there is evidence in the record that Sagasta directly told Plaintiff not to engage in the protected activity he was engaging in. On June 12, 2002, Sagasta allegedly summoned Plaintiff into her office after she learned that he had complained to People Services. Sagasta directed Plaintiff not to telephone People Services again, but instead, to complain directly to her.

Finally, this Court finds that a reasonable inference of retaliation could be drawn from the circumstances of Plaintiff's termination. Plaintiff filed his Complaint in this action on December 12, 2003. Importantly, however, it could be inferred from the evidence that Defendants had notice that Plaintiff intended to file a federal action because its employees allegedly witnessed Plaintiff having his Complaint notarized on December 9, 2003, as evidenced by the fact that the next day, Alan Tanner allegedly told Plaintiff that "we knew that was the direction you were going." In addition, Sagasta advised Plaintiff of certain deficiencies in his work performance the very next day after his Complaint was notarized, and just two days before he filed it.

Further, on December 11, 2003, Sagasta summoned Plaintiff to her office to further discuss his deficiencies and work assignments. Disputed issues of fact exist as to what happened during this meeting, but both parties agree that it became heated and Plaintiff left the premises. Plaintiff was fired the next day, December 12, 2003, which was just three

days after Defendants allegedly had notice of his intention to file a Complaint in federal court.  The very close timing of these events coupled with the unresolved issues of fact discussed above precludes a finding that Defendants are entitled to summary judgment on Plaintiff's retaliation claim.  In this Court's view, a reasonable factfinder could view this evidence and conclude that Defendants' proffered reasons for its employment actions are false, and that unlawful retaliation is the actual reason.  Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim will therefore be denied.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part consistent with this Decision and Order.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 53) is GRANTED in part and DENIED in part consistent with this Decision and Order.

FURTHER, that Defendants Carol Sagasta and Candace McTigue are DISMISSED from this case.

FURTHER, that Plaintiff and counsel for Defendant RadioShack shall appear before the Hon. Victor E. Bianchini, United States Magistrate Judge at 501 U.S. Courthouse, 68 Court Street, Buffalo, New York  for a settlement conference on November 17,  2006, at 10:00 a.m..

SO ORDERED.

Dated:   September 29, 2006
        Buffalo, New York

                                        /s/William M. Skretny
                                         WILLIAM M. SKRETNY
                                        United States District Judge